**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Ergotron, Inc.,

                    Plaintiff,              **MEMORANDUM OPINION**
                                       **AND ORDER**
      v.                               Civil No. 10-2010 ADM/JJG

Rubbermaid Commercial Products, LLC,

                    Defendant.

---

Kurt J. Niederluecke, Esq., and Laura L. Myers, Esq., Fredrikson & Byron, PA, Minneapolis, MN, on behalf of Plaintiff.

Stephen M. Hankins, Esq., and Shelley L. Merkin, Esq., Schiff Hardin LLP, Chicago, IL, and San  Francisco, CA, on behalf of Defendant.

---

## I.  INTRODUCTION

On June 15, 2012, the undersigned United States District Judge heard oral argument on Defendant Rubbermaid Commercial Products, LLC's ("Rubbermaid") Motion for Summary Judgment of Non-Infringement [Docket No. 79] (the "Summary Judgment Motion"). Rubbermaid also filed a Motion to Exclude Expert Testimony from Arthur Cobb [Docket No. 81] (the "Cobb Daubert Motion").  Similarly, Plaintiff Ergotron, Inc. ("Ergotron") filed a Motion to Exclude Expert Testimony from Melissa Snelson [Docket No. 74] (the "Snelson Daubert Motion").  For the reasons set forth below, all motions are denied.

## II.  BACKGROUND[1]

Plaintiff Ergotron asserts a single claim of patent infringement, of its U.S. Patent No. 6,189,849 (the "'849 Patent"), against Defendant Rubbermaid.  The '849 Patent covers a lift system for a flat panel monitor and keyboard that is vertically adjustable and stores in a minimum profile.  Am. Compl. [Docket No. 25] Ex. A ("'849 Patent") col.1 ll.10-13.  The application for the '849 Patent was filed in May 1998 and the patent was issued in February 2001.  '849 Patent at [22], [45].

### A.  Technology at Issue

The '849 Patent is a part of a field of technology used in the health care industry known as electronic medical record workstations.  May 25, 2012 Decl. of Grant D. Fairbairn in Supp. of Ergotron's Mem. in Opp'n to Rubbermaid's Mot. for Summ. J. [Docket No. 95] ("3d Fairbairn Decl.") Ex. D ("Chochinov Dep.") 21:13-22 (explaining field of electronic medical record workstations).  Electronic medical record workstations generally are of two varieties–carts or wall-mounted.  Id. 21:14-17.  The '849 Patent covers a wall-mounted system (although the invention can be mounted to other surfaces or supports).  '849 Patent col.1 ll.27-31.  The system covered by the '849 Patent provides for tandem movement of a flat panel monitor and keyboard, as both components are mounted to a common "transport assembly."  '849 Patent col.1 ll.32-35, col.1 ll.51-53.  Ergotron manufactures, markets, and distributes a lift system embodying the '849 Patent under the trademark "StyleView."  Am. Compl. ¶ 8.

In 2007, Defendant Rubbermaid hired a market consultant to detail the wall-mounted electronic medical record workstation market.  See generally 3d Fairbairn Decl. Ex. E

---

[1]  On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party.  Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).

(describing wall-mounted market).  In 2008, Rubbermaid began developing a wall-mounted

workstation.  3d Fairbairn Decl. Ex. F.  In 2010, Rubbermaid began selling wall-mounted

workstations known as its "Slim Line" and "Tandem Arm" products (the "Accused Products").

Chochinov Dep. 22:10–23:9.  The Slim Line and Tandem Arm product lines are sold in both

standard and premium models.  Apr. 27, 2012 Decl. of Shelley Merkin in Supp. of Rubbermaid

Commercial Prods., LLC's Mot. to Exclude Testimony from Arthur Cobb [Docket No. 88] ("2d

Merkin Decl.") Ex. A.

**B.  '849 Patent Claims**

Ergotron alleges the Accused Products infringe claims 1, 2, 4, 5, 6, 19, and 20 of the '849

Patent.  Claim 1 is an independent claim upon which the other allegedly infringed claims depend.

Rubbermaid has admitted the presence of all elements of claim 1 in the Accused Products except

element (c).  3d Fairbairn Decl. Ex. K.  Element (c) states:

> means attached to said vertically oriented support panel between said first and second
> spaced apart vertically oriented and vertically movable rails for providing supported
> vertical linear motion and positioning of said vertically elevatable transport assembly
> with respect to said vertically oriented support panel and for maintaining said vertically
> elevatable transport assembly at the desired vertically elevated position when raised
> above the fully down position.

'849 Patent col.9 ll.8-16.

By Order dated June 10, 2011 [Docket No. 47] (the "Markman Order"), the Court

construed certain disputed claim terms including element (c) of claim 1.  The parties agreed

element (c) required a mean-plus-function analysis, and the function was construed as

"providing linear motion and positioning of the transport assembly and maintaining the transport

assembly at the desired vertically elevated position."  Markman Order at 5–6.  The

corresponding structure was construed as "a linkage assembly comprised of a gas spring

connected on one end by a pivot to an adjuster and connected on the other end to an arm, the

adjuster is attached in turn to the angle bracket that is anchored to the lift system, and their

equivalents." Id. at 11.

This construction was given to the corresponding structure because those are the parts

disclosed in the specification of the '849 Patent *necessary* to accomplish the function of

"providing linear motion and positioning of the transport assembly and maintaining the transport

assembly at the desired vertically elevated position." See Northrop Grumman Corp. v. Intel

Corp., 325 F.3d 1346, 1352 (Fed. Cir. 2003) ("A court may not import into the claim features

that are unnecessary to perform the claimed function.") (citation omitted).  The parts work as

follows: as the transport assembly is moved up and down, the gas spring pivots at the adjuster to

maintain contact with the transport assembly through the arm, thereby providing linear motion

and positioning.  Markman Order at 8–9 (describing how all components in patent specification

function and identifying which are essential).  The gas spring is held to the workstation by the

adjuster and angle bracket.  '849 Patent col.4 ll.52-55.  The adjuster adjusts the placement of the

pivot point of the gas spring, which in turn allows the gas spring to support a range of different

payloads.  Apr. 27, 2012 Decl. of Shelley Merkin in Supp. of Rubbermaid Commercial Prods.,

LLC's Mot. for Summ. J. of Non-Infringement [Docket No. 85] ("1st Merkin Decl.") Ex. C

91:7-21, 102:25–103:4; April 27, 2012 Decl of Frank Fronczak [Docket No. 86] ("Fronczak

Decl.") ¶ 32.

## C.  The Accused Products

The Accused Products also include a gas spring as a component part.  However, the

Accused Products work in a somewhat different manner.  The gas spring in the Accused

Products is located outside of the rails of the workstation on which the monitor and keyboard's transport assembly slides.  May 25, 2012 Decl. of Dr. Arthur Erdman [Docket No. 96] ("Erdman Decl.") Ex. A at 17.  The gas spring in the specification of the '849 Patent is between those rails. '849 Patent figs. 3-6.  The gas spring in the Accused Products does not rotate, it remains vertical at all times.  See Fronczak Decl. ¶ 34 ("The gas spring in the Rubbermaid Products does not pivot as the transport assembly moves . . . .").  The gas spring in the Accused Products directly contacts the transport assembly, without use of an arm.  Id.  The gas spring is connected to the workstation by way of a hex nut and "upper spring" bracket on one end and a hex head cap screw and "lower spring" bracket on the other end.  Erdman Decl. Ex. A at 17.  The Accused Products do not include an adjuster.  See id.

When the transport assembly is at the desired vertically elevated position, users of the Accused Products may engage a locking mechanism to maintain that position.  See Erdman Decl. Ex. A at 19 (describing how "pivoting pins" and "detents" allow users of Accused Products to lock device at desired vertical positions).  However, the parties dispute whether the locking mechanism is actually necessary to maintain such a position.  Rubbermaid claims the gas spring is designed to provide more force than necessary to support the weight of the transport assembly loaded at capacity, and therefore without the locking mechanism the transport assembly cannot maintain its position and would move upward.  Fronczak Decl. ¶¶ 36-37. Ergotron claims the internal frictional forces of the workstation cause the transport assembly to maintain an elevated position even without the locking mechanism over certain ranges.  Erdman Decl. Ex. A at 17–19.  At oral argument, Ergotron's demonstrative video showed counsel adjusting one of the Accused Products to different elevated positions, and the transport assembly

remaining at those positions without use of the locking mechanism.  However, Ergotron's expert

on this issue concedes the use of the locking mechanism allows a greater range of vertical

positions which the Accused Products will be capable of maintaining, although he claims the

same is true for the invention described in the '849 Patent.  Erdman Decl. Ex. A at 19.

       In addition to the components that aid vertical movement and positioning, the Accused

Products include other features, many of which are not covered by the '849 Patent or other

patents or are available on products sold by Ergotron.  2d Merkin Decl. Exs. A, B.  Additionally,

the Accused Products sell for a significantly higher price than the commercial embodiments of

the '849 Patent sold by Ergotron.  2d Merkin Decl. Ex. B.

**D.  Damages Experts**

       Both parties have retained expert witnesses to opine on the appropriate calculation of

damages.  Rubbermaid retained Melissa Snelson ("Snelson"), who opines that damages should

be calculated using a royalty rate of 0.4% of net sales, and not greater than 2.4% of net sales in

any event.  Apr. 20, 2012 Decl. of Grant D. Fairbairn [Docket No. 77] ("1st Fairbairn Decl.") Ex.

B ("Snelson Report") at 3.  Snelson avers she reached her result through application of the

fifteen factors enumerated in Georgia-Pacific Corp. v. U.S. Plywood Corp., 318 F. Supp. 1116

(S.D.N.Y. 1970).  Snelson Report at 3, 5–23.  Critical to her analysis, however, was the

anticipated profits of Rubbermaid.  Megan Turner, a former product manager at Rubbermaid,

testified that Rubbermaid had a "target" profit margin of 40%.  1st Fairbairn Decl. Ex. D at

181:15–182:9.  Rubbermaid estimated the profit margin on the Accused Products to be 42.4%

for 2010, the year of their launch.  Snelson Report Ex. 7.  The estimated profit margin for the

Slim Line alone was 40.4% for 2010.  Id.  Snelson reasoned that the 40% profit margin would

"effectively limit[]" the royalty Rubbermaid would agree to pay Ergotron in a hypothetical

negotiation.  Snelson Report at 12.

Also critical to Snelson's analysis is the ability of Rubbermaid to develop non-infringing

alternative technology for use in the Accused Products.  Based on discussion with Rubbermaid

engineers, Snelson estimated it would cost $7.00 per unit to design around the '849 Patent.  Id. at

25.  Snelson's figure derived from the cost of adding a steel coil extension spring and pulley

rather than a gas spring, and Snelson opines no additional incremental costs for design and

development would be incurred by Rubbermaid because such design and development would be

subsumed within current, salaried employees' regular duties.  Id.  Based on the additional $7.00

cost, Snelson opines 1.0% to 1.6% of net sales would be a reasonable royalty rate.  Id. at 26.

Snelson avers this design-around calculation was used as a check on the reasonableness of her

initial 0.4 %–2.4% range.  May 25, 2012 Decl. of Shelley Merkin [Docket No. 93] ("3d Merkin

Decl.") Ex. B at 10:10-13, 181:12-19.

Ergotron retained Arthur Cobb ("Cobb") as its expert witness.  Cobb opines damages

should be calculated using a royalty rate of 10% of net sales and a one-time lump sum payment

of $100,000.  2d Merkin Decl. Ex. D ("Cobb Report") at 2, 21–22.  In arriving at his royalty

opinion, Cobb noted that Ergotron would likely "require" a royalty rate of greater than 20.0%.

Id. at 20.  He further opined that Rubbermaid "would not be expected to accept a gross margin of

less than approximately 30.0 [%], a reduction of greater than 10.0[%]."  Id. at 21.  From these

considerations, Cobb concluded that a running royalty rate of 10.0% would be a the result of a

hypothetical negotiation.  See id.  When questioned about how precisely he chose 10.0%, Cobb

stated that many factors, such as expected sales and risks, "start to center in on 10[%]."  2d

Merkin Decl. Ex. I at 209:10-14.

Cobb calculated the 10% royalty rate from the total revenue derived from Rubbermaid's

Accused Products, without apportioning between the components alleged to infringe the '849 Patent and other components, for a total of $452,117.00. Id. at 21. In his report, Cobb noted that the "basis for customer demand" for the Accused Products is the low profile and vertical lift features and that the value of the component parts of the Accused Products is "substantially created" by infringement of the '849 Patent. Id. at 18. In patent law, the "entire market value rule" calls for the royalty base to be calculated from all revenue of a product, notwithstanding the presence of non-patented components, when the "basis for customer demand" owes to infringing components or when the value is "substantially created" by infringing features. Rite-Hite Corp. v. Kelley Co., 56 F.3d 1538, 1549 (Fed. 1995). However, at his deposition, Cobb claimed he did not apply the "entire market value rule" in forming his damages opinion. 2d Merkin Decl. Ex. I at 232:19-23.

The $100,000 lump-sum payment Cobb justifies as a recovery of costs related to due diligence, negotiation, and drafting of a license agreement. Cobb Report at 20. Cobb, however, did not specifically analyze how much time, and at what hourly cost, could be expected for these tasks. 2d Merkin Decl. Ex. I. at 211:20–215:7. Rather, Cobb avers $100,000 is within the range typically produced by negotiation in his experience. May 25, 2012 Decl. of Grant D. Fairbairn in Supp. of Ergotron's Opp'n to Rubbermaid's Mot. to Exclude Testimony from Arthur Cobb [Docket No. 90] ("2d Fairbairn Decl.") Ex. D at 216:25–2:17:24.

**E. Procedural Posture**

On May 10, 2010, Ergotron initiated this present action. Rubbermaid now moves for summary judgment. In addition, both parties have moved to exclude the testimony of the opposing damages expert.

8

### III.  DISCUSSION

**A.  Summary Judgment**

    **1.  Standard of Review**

        Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment shall issue "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); <u>see also</u> <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252 (1986); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party.  <u>Ludwig</u>, 54 F.3d at 470.  The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial."  <u>Krenik v. Cnty. of Le Sueur</u>, 47 F.3d 953, 957 (8th Cir. 1995).

    **2.  Genuine Issue of Material Fact Exists Whether Accused Products Infringe '849 Patent**

        The parties agree the infringement analysis here turns on whether Rubbermaid's Accused Products infringe element (c) of claim 1.  Because the other asserted claims are dependent claims of claim 1, if claim 1 is not infringed neither are its dependent claims.  Determining infringement requires two steps: (1) the claim must be properly construed to determine its scope and meaning, and (2) the construed claim must be compared to the accused device.  <u>Applied Med. Res. Corp. v. U.S. Surgical Corp.</u>, 448 F.3d 1324, 1332 (Fed. Cir. 2006).  "To prove infringement, the patentee must show that the accused device meets each claim limitation either literally or under the doctrine of equivalents."  <u>Catalina Marketing Int'l, Inc. v. Coolsavings.com, Inc.</u>, 289 F.3d 801, 812 (Fed Cir. 2002) (citation omitted).

        As discussed above, element (c) has been construed, and the parties agree it is a means-

plus-function term. "Literal infringement of a means-plus-function claim limitation requires that the relevant structure in the accused device perform the *identical function* recited in the claim and be *identical or equivalent* to the *corresponding structure* in the specification." <u>Applied Med. Res.</u>, 448 F.3d at 1333 (citation omitted) (emphasis added). An "equivalent" structure in an accused device is one that performs the identical function in substantially the same way with substantially the same result as the structure disclosed in the specification. <u>Id.</u> Infringement, whether literal or under the doctrine of equivalents, is a question of fact. <u>Bai v. L & L Wings, Inc.</u>, 160 F.3d 1350, 1353 (Fed. Cir. 1998).

In its opening memorandum seeking summary judgment, Rubbermaid argued that the doctrine of prosecution history estoppel barred Ergotron from pursing an infringement theory under the doctrine of equivalents. Ergotron responded it was not pursuing an infringement theory under the doctrine of equivalents. Ergotron's Mem. in Opp'n to Rubbermaid's Mot. for Summ. J. [Docket No. 94] at 11. Furthermore, with respect to literal infringement, there is no dispute that the structure in the Accused Products is not identical to that disclosed in the specification of the '849 Patent. <u>Id.</u> Therefore, the only issue to be considered with respect to literal infringement is whether the Accused Products infringe the '849 Patent under a structural equivalence theory.

A structure is equivalent if it performs the claimed function in "substantially the same way to achieve substantially the same result as the corresponding structure described in the specification." <u>Odetics, Inc. v. Storage Tech. Corp.</u>, 185 F.3d 1259, 1267 (Fed. Cir. 1999) (citation omitted). Stated another way, "[t]he proper test is whether the differences between structure in the accused device and any disclosed in the specification are insubstantial." <u>Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus.</u>, 145 F.3d 1303, 1309 (Fed. Cir. 1998) (citations omitted). What constitutes an equivalent structure is context-specific. <u>IMS Tech., Inc.</u>

v. Haas Automation, Inc., 206 F.3d 1422, 1436 (Fed. Cir. 2000) ("[T]wo structures that are equivalent in one environment may not be equivalent in another."). Specifically, when the "disclosed physical structure is of little or no importance to the claimed invention, there may be a broader range of equivalent structures than if the physical characteristics of the structure are critical in performing the claimed function in the context of the claimed invention." Id. Individual components are not limitations, rather the only limitation is the overall structure corresponding to the claimed function. Odetics, 185 F.3d at 1268.

Here, the claimed function of the '849 Patent is "providing linear motion and positioning of the transport assembly and maintaining the transport assembly at the desired vertically elevated position." This function is two-fold, "providing linear motion and position" on one hand and "maintaining the transport assembly at the desired vertically elevated position" on the other. The parties do not dispute whether the structure in the Accused Products provides linear motion and support in substantially the same way with substantially the same result as the structure disclosed in the '849 Patent. Rather, the focus of the dispute is whether the structure in the Accused Products maintains the desired vertically elevated position of the transport assembly in an equivalent fashion. The dispute regarding whether the Accused Products can maintain such a position, in turn, generally focuses on the use of a locking mechanism and the rotation of the linkage assembly disclosed in the '849 Patent. Each is discussed below.

### (a) Locking Mechanism

Rubbermaid argues the Accused Products cannot maintain the position of a transport assembly without the use of a locking mechanism. Specifically, the gas springs in the Accused Products are designed to always provide more force than necessary to support the payload of the transport assembly. Fronczak Decl. ¶ 37. Therefore, Rubbermaid avers, without using a locking mechanism, the transport assembly will not maintain its position but instead will rise to the top

11

position.  Id.

However, Ergotron has provided specific evidence to the contrary.  Ergotron's infringement expert avers internal friction allows the Accused Products to maintain the position of an equipped transport assembly over a range of positions, as was shown in a demonstrative video at oral argument.  Erdman Decl. Ex. A at 17–19.  In fact, Rubbermaid's expert concedes that a range of positions can be maintained by the Accused Products, but notes that these position may not be "necessarily at the desired positions for [] users."  Fronczak Decl. ¶ 35.

Rubbermaid argues the range over which the Accused Products perform the function of "maintaining position" without a locking mechanism is too small to be the claimed function of the '849 Patent.  At claim construction, the function was construed as "providing linear motion and positioning of the transport assembly and maintaining the transport assembly *at the desired vertically elevated position*."  Markman Order at 6 (emphasis added).  Whether the range of positions over which the Accused Products can maintain the position of an elevated transport assembly are desired positions for users is a disputed fact issue.  Ergotron has provided evidence that at some payloads, position will be maintained over a wide range of positions.  At a payload of twenty-six pounds, one of the Accused Products, the Premium Tandem Arm, the transport assembly could maintain its position without the locking mechanism for slightly over half of the product's entire range of motion.  Erdman Decl. Ex. B at 117:20-118:1.  At a payload of thirty-one pounds, the transport assembly could maintain its position over almost the entire range of motion.  Id. at 118:21-24.  Whether these ranges and payloads mean the Accused Products perform the claimed function and infringe the '849 Patent are questions of fact for a jury.  A genuine issue of material fact exists as to whether the locking mechanism is critical for the Accused Products to perform the claimed function.  Therefore, summary judgment is inappropriate.

**(b) Rotation of Linkage Assembly**

The next grounds for summary judgment urged by Rubbermaid concern the rotation of the linkage assembly disclosed in the '849 Patent. The linkage assembly as disclosed in the '849 Patent functions as follows. The linkage assembly rotates on a pivot from a downward to an upward position as the transport assembly is moved upward. '849 Patent figs. 4-6. Because the linkage assembly rotates, it must be connected to a pivot to allow that rotation. In the specification of the '849 Patent, that pivot is located at the end of the adjuster. '849 Patent col.4 ll.55-57. The linkage assembly is a two-member or two-bar linkage assembly, comprised of a gas spring and an arm. 1st Merkin Decl. Ex. B at 69:10–70:1; '849 Patent fig. 4. The gas spring can provide force only in one direction relative to itself, i.e. it can only push out. E.g., Fronczak Decl. ¶ 28. The gas spring pushes on the arm. Fronczak Decl. ¶¶ 15, 18, 28. The transport assembly also pushes on the arm. Id. ¶ 18. The linkage assembly does not contact the transport assembly at its center, but rather at its edge. '849 Patent figs. 3-6. According to the laws of physics, any time a force is applied to an object somewhere other than its center, the object will have a propensity to rotate. Chris H. Luebkeman & Donald Peting, What is a Moment?, http://web.mit.edu/4.441/1_lectures/1_lecture5/1_lecture5.html. This propensity to rotate is called a "moment of force," id., referred to by the parties and in common usage solely as a "moment." In order for the transport assembly to maintain a position, all forces and moments acting upon it must be in equilibrium. Fronczak Decl. ¶ 20. In the structure disclosed in the specification of the '849 Patent, the force and moment provided by the linkage assembly, provided by the pressure of the gas spring, and the internal friction of the workstation counterbalance the downward force of the weight of the transport assembly causing the transport assembly to maintain an elevated position. Fronczak Decl. ¶¶ 24-25; 1st Merkin Decl. Ex. B at 83:4–84:2; Erdman Decl. Ex. A at 15.

The linkage assembly in the Accused Products works as follows.  The linkage assembly in the Accused Products does not rotate.  Fronczak Decl. ¶ 34.  The linkage assembly is vertically oriented and remains so at all times as the transport assembly moves up or down.  Id.  The linkage assembly contacts the transport assembly at its edge, not its center, and therefore creates a moment that is counterbalanced by the workstation.  See Erdman Decl. ¶ 13 (noting moment is created by gas spring in Accused Products because force contracts transport assembly away from its center of gravity).  The linkage assembly is primarily a gas spring with anchoring structure.  See Erdman Decl. Ex. A at 17 (describing structure of linkage assembly in Accused Products).  The upward force of the gas spring, the downward force of the transport assembly, and the internal friction of the workstation counterbalance so that the transport assembly can maintain an elevated position over a certain range of positions.  Erdman Decl. Ex. A at 17–19.

Therefore, differences exist in the way the linkage assembly disclosed in the specification of the '849 Patent and the linkage assembly in the Accused Products achieve the result of maintaining the position of the transport assembly.  Simply put, the linkage assembly in the Accused Products does not rotate.  Because it does not rotate, it does not include structures necessitated by rotational movement—namely an arm or a pivot (housed in an adjuster).  However, whether or not these differences are insubstantial is a question of fact.

Equivalence is determined in reference to what physical characteristics of the disclosed structure are critical to the claimed function in the context of the invention.  IMS Tech., 206 F.3d at 1436.  On the present record, it cannot be said that the rotational aspect of the linkage assembly disclosed in the '849 Patent is so critical that no reasonable jury could find otherwise.  The claimed function in dispute is maintaining position of the transport assembly.  The primary physical characteristics that make this function possible in the disclosed structure are the force provided by a gas spring and the presence of internal friction, which cause all forces and

moments to counterbalance when the transport assembly is in the desired elevated position.  The

Accused Products are also able to maintain a transport assembly in a desired elevated position

through the force provided by a gas spring and the presence of internal friction.  The importance

of internal friction in this context should not be understated.  See 1st Merkin Decl. Ex. C at

103:13-16 ("[The] inherent friction within the system . . . is really what makes it so it's stable.").

In fact, the inventors of the '849 Patent initially believed that a locking mechanism would be

required to counteract "vertical drift" and achieve the function of maintaining the position of the

transport assembly.  1st Merkin Decl. Ex. B at 81:19–83:11.  However, the inventors abandoned

this notion upon discovering internal friction allowed moments and forces to balance without

need of a locking mechanism.  Id. at 83:11–84:2.

        In this case, a reasonable jury could find that rotation is not a critical characteristic and

any differences are insubstantial.  This is not a case where the two structures rely on opposing

principles or fundamental differences–both structures rely on the force of a gas spring and

friction to accomplish the same function of maintaining the transport assembly at a given

position.  Ergotron's expert has opined that this manner of function, using friction and the force

of a gas spring, is the same, and therefore the Accused Products perform the identical function in

substantially the same way to achieve substantially the same result as the structure disclosed in

the '849 Patent.  Erdman Decl. Ex. A at 16, 20.  Indeed, structural equivalence in a mean-plus-

function infringement analysis is closely related to the doctrine of equivalents.  See Chiuminatta,

145 F.3d at 1310 (noting tests  for structural equivalence and for infringement under doctrine of

equivalents are "closely related").  Under the doctrine of equivalents, rearrangement of parts

does not preclude a finding of infringement.  See Sanitary Refrigerator Co. v. Winters, 280 U.S.

30, 42–43 (1929) (holding two "reciprocal changes" in form of structure was insufficient to

avoid infringement).  A reasonable jury could find the linkage assembly in the Accused Products

to be an insubstantial rearrangement of linkage assembly disclosed in the '849 Patent.

Similarly, the absence of some component parts of the disclosed structure in the linkage assembly of the Accused Products is not fatal to a finding of equivalence. Component-by-component analysis is not required; rather, comparison of overall structures is determinative. Odetics, 185 F.3d at 1268. The absence of rotational components could be dispositive if rotation were critical to the performed function. However, a reasonable jury could find that rotation is not critical to the performed function. Likewise, the absence of an adjuster, cited by Rubbermaid, could be dispositive if adjustability were the claimed function. The adjuster is not critical to the claimed function. 1st Merkin Decl. Ex. B at 72:10-13. The adjuster allows the geometry of the linkage assembly and workstation to change to accommodate different payloads of the transport assembly. Fronczak Decl. ¶¶ 30, 39. In the context of element (c) of claim 1, however, adjustment is not the function claimed. The importance of the adjuster in this context is only to provide a location for the pivot and to connect to the angle bracket, see 1st Merkin Decl. Ex. C at 90:4-6 (stating purpose of angle bracket is to create mounting place for adjuster), which in turn anchors the linkage assembly to the workstation itself. The Accused Products have a hex head cap screw and "lower spring" bracket to anchor the linkage assembly to the workstation. Erdman Decl. Ex. A at 17. In summary, there are clearly differences between the disclosed structure and the structure in the Accused Products. However, whether these differences are insubstantial or not is a jury question. Rubbermaid's motion for summary judgment is denied.

## B. **Daubert** Motions

Each party has retained an expert to opine on the proper measure of damages if infringement is ultimately found, and each party has moved to exclude the other party's expert testimony on damages. Rule 702 of the Federal Rules of Evidence governs the admission of

expert testimony.  Under Rule 702, an expert may testify if (1) the expert's scientific, technical, or other specialized knowledge will help the trier of fact understand the evidence or determine a fact in issue, (2) the testimony is based on sufficient facts or data, (3) the testimony is the product of reliable principles and methods, and (4) the expert has reliably applied those principles and methods to the facts of the case.  Fed. R. Evid. 702.  Therefore, district courts faced with a proffer of expert scientific testimony must make a preliminary assessment of "whether the reasoning or methodology underlying the testimony is scientifically valid" and "whether that reasoning or methodology properly can be applied to the facts in issue." Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 592–93 (1993).  A court must exclude expert testimony if it is "so fundamentally unreliable that it can offer no assistance to the jury." Meterlogic, Inc. v. KLT, Inc., 368 F.3d 1017, 1019 (8th Cir. 2004).  Daubert and its progeny "provide[] a district court with the discretion necessary to close the courtroom door to 'junk science' and to admit reliable expert testimony that will aid the trier of fact." Robinson v. GEICO Gen. Ins. Co., 447 F.3d 1096, 1100 (8th Cir. 2006) (citation omitted).

The expert testimony challenged here would address the issue of damages to the claimant.  "A reasonable royalty is the predominant measure of damages in patent infringement cases." Uniloc USA, Inc. v. Microsoft Corp., 632 F.3d 1292, 1312 (Fed. Cir. 2011) (citations omitted); see also 35 U.S.C. § 284 ("Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer . . . .").  "A reasonable royalty can be calculated from an established royalty, the infringer's profit projections for infringing sales, or a hypothetical negotiation between the patentee and infringer based on the factors in Georgia–Pacific." Wordtech Sys., Inc. v. Integrated Networks Solutions, Inc., 609 F.3d 1308, 1319 (Fed. Cir. 2010).  The fifteen non-exclusive Georgia-Pacific factors are:

1. The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty.

2. The rates paid by the licensee for the use of other patents comparable to the patent in suit.

3. The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.

4. The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.

5. The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter.

6. The effect of selling the patented specialty in promoting sales of other products of the licensee; that existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales.

7. The duration of the patent and the term of the license.

8. The established profitability of the product made under the patent; its commercial success; and its current popularity.

9. The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.

10. The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.

11. The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.

12. The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

13. The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

14. The opinion testimony of qualified experts.

15. The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee- who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention- would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

Georgia-Pacific, 318 F. Supp at 1120.  Both Ergotron's and Rubbermaid's experts aver they

applied the Georgia-Pacific factors in determining a royalty rate based on a hypothetical

negotiation.  Issues related to Rubbermaid's expert, Snelson, will be considered first before

turning to Ergotron's expert, Cobb.

## 1. **Daubert Motion Regarding Testimony of Snelson**

Snelson opines a reasonably royalty rate is 0.4% of net sales, but in no event greater than

2.4% of sales.  Snelson Report at 3.  Snelson's opinion was heavily influenced by the target

profits of Rubbermaid.  See Snelson Report at 12 (stating 40% margins for Rubbermaid

"effecively limit[] the amount of a royalty that Rubbermaid could pay Ergotron").  Furthermore,

Snelson avers she used the cost of designing a non-infringing alternative for Rubbermaid as a

"check" on her work.  3d Merkin Decl. Ex. B at 10:10-13, 181:12-19.

"[I]t is settled law that an *infringer's* net profit margin is not the ceiling by which a

reasonable royalty is capped."  Powell v. Home Depot U.S.A., Inc., 663 F.3d 1221, 1238 (Fed.

Cir. 2011) (emphasis in original).  "While either the infringer's or the patentee's profit

expectations may be considered in the reasonable royalty analysis . . . neither is an absolute limit

. . . ."  Id. at 1238–39 (citations omitted).  Likewise, the costs of implementing a non-infringing

alternative cannot cap reasonable royalty damages as a matter of law.  Mars, Inc. v. Coin

Acceptors, Inc., 527 F.3d 1359, 1373 (Fed. Cir. 2008).  Ergotron argues Snelson's analysis runs

afoul of these rules because she used Rubbermaid's profit expectations and design-around costs

as an absolute ceiling capping damages.  Ergotron argues, therefore, that Snelson's methods are

unreliable because they misapply the law of damages.

Ergotron's arguments are unavailing.  Snelson indeed repeatedly states that 2.4% would

be a "cap" on the royalty rate.  E.g., Snelson Report at 13.  Nonetheless, the context of Snelson's

statements makes it apparent that her conclusion is based not on a misapplication of the law–i.e.

a belief that damages should always be capped based on an infringer's expected profits or

design-around costs–but rather her analysis of the facts of this case.  See, e.g., Snelson Report at

10–13 (discussing profit margin of Rubbermaid and stating that for purposes of factor eight

under Georgia-Pacific, royalty would have a "cap"); Critical to Snelson's analysis was the

availability of Rubbermaid personnel to engineer a non-infringing alternative at low-cost.

Snelson believed this alternative would supply sufficient bargaining power to Rubbermaid that it

would not agree to a royalty rate that generated profits below its 40% target.  See Snelson Report

at 23 ("[H]ad Rubbermaid not chosen to design around the '849 Patent, the parties would have

agreed to a running royalty rate of 0.4% of net sales but, in any event, no more than 2.4% of net

sales."); 1st Fairbarn Decl. Ex. C at 154:1-10 (testifying that design-around costs would

"effectively" cap damages).  Furthermore, the cases cited by Ergotron all relate to *courts*, not

experts, imposing caps based on expected profits as a matter of law.  Powell, 663 F.3d at

1237–41 (rejecting argument that damages had to be capped to allow profit margin for infringer

as a matter of law and affirming damages awarded by jury); Mars, 527 F.3d at 1373 (holding that

reasonable royalty damages are not capped at cost of non-infringing alternative as a matter of

law); Golight, Inc. v. Wal-Mart Stores, Inc., 355 F.3d 1327, 1338 (Fed. Cir. 2004) (rejecting

argument that court should have capped damages based on infringer's profit margin); State

Indus. v. Mor-Flo Indus., 883 F.2d 1573, 1580–81 (Fed. Cir. 1989) (same); Spectralytics, Inc. v.

Cordis Corp., 650 F. Supp. 2d 900, 910 (D. Minn. 2009) ("[T]he jury was not *required* to treat

the cost of either [non-infringing] alternative as a cap on the damages in this case.") (emphasis added).

It is not improper for an expert to consider profits of an infringer, rather, it is endorsed. Powell, 663 F.3d at 1238–39 (noting that the profit expectation of an infringer may be considered in the overall reasonably royalty analysis) (citing Geogia-Pacific, 318 F. Supp. At 1120).  Likewise, it is not improper to consider the costs of non-infringing alternatives in calculating a reasonable royalty.  See Zygo Corp. v. Wyko Corp., 79 F.3d 1563, 1571–72 (Fed. Cir. 1996) (ruling that existence of non-infringing device "in the wings" is a factor to consider in determining royalty that would result from hypothetical negotiations).  Therefore, in essence, Ergotron's objection to Snelson's opinion is that she relied too heavily upon Rubbermaid's profits and design-around costs.  However, the weight given to each factor varies on context; not every factor need be considered in every case or be given the same weight.  See Lucent Tech., Inc. v. Gateway, Inc., 580 F.3d 1301, 1325–35 (Fed. Cir. 2009) (affording different weights to various Georgia-Pacific factors and not analyzing some). The weight Snelson ultimately gave to each factor is a matter best tested by cross-examination, and does not warrant the wholesale exclusion of her testimony.  See Oxford Gene Tech. Ltd. v. Mergen Ltd., 345 F. Supp. 2d 431, 441–42 (D. Del. 2004) (holding expert report satisfied Rule 702 and heavy reliance on two of fifteen Georgia-Pacific factors went to weight and not admissibility of opinion).

Ergotron argues that Snelson's application of the Georgia-Pacific factors was nevertheless unreliable because she applied those factors to an impermissibly limited range. Ergotron avers Snelson confined her analysis to the 0.4% to 2.4% range and then used the Georgia-Pacific factors to determine where within that range her ultimate opinion would fall. Ergoton's argument, however, rests on a biased reading of Snelson's testimony.  When asked if

she used the Georgia-Pacific factors in that manner, Snelson responded "Not specifically."  1st

Fairbairn Decl. Ex. B at 149:15-19.  Again, Ergotron's arguments go to the weight Snelson gave

specific factors.  This may provide fodder for impeachment, but is not a bar to the admissibility

of Snelson's testimony.

Ergotron also argues that Snelson unreliably applied the facts because she applied

Rubbermaid's 40% profit "target" as a profit "requirement."  This difference is not of such a

magnitude that Snelson's testimony is so fatally unreliable that it will offer no assistance to a

jury.  Disputes over such factual particulars, again, go to the credibility of expert testimony, not

its admissibility.  See David E. Watson, P.C. v. United States, 668 F.3d 1008, 1014 (8th Cir.

2012) (ruling that failure to consider some facts goes to credibility of expert unless expert failed

to take into account a plethora of specific facts).  The Snelson Daubert Motion is denied.

## 2.  **Daubert Motion Regarding Testimony of Cobb**

Similarly, Rubbermaid has moved to exclude testimony from Ergotron's damages expert

Cobb.  In his report, Cobb opined that a hypothetical negotiation between the parties would

produce a royalty rate of 10% of net sales and a one-time lump-sum payment of $100,000.00.

Cobb Report at 2, 21–22.  Rubbermaid argues Cobb's opinion is fatally unreliable because (1) it

was improper to apply the "entire market value rule," (2) even if appropriate to apply, Cobb's

entire market value rule analysis was not supported by sufficient facts, and (3) Cobb's opinion

regarding a lump-sum payment was not supported by sufficient facts.  Each is discussed in turn

below.

The entire market value rule allows a patentee to assess damages based on the entire

market value of the accused device when the patented feature creates the "basis for customer

demand" or "substantially creates the value of the component parts."  Uniloc, 632 F.3d at 1318.

The test for the application of the entire market value rule has been stated as when the patented and unpatented components are analogous to a "single functioning unit." Rite-Hite, 56 F.3d at 1550.

There is no dispute that the Accused Products contain many non-patented features. However, there is also no dispute that the Accused Products are lift systems for use as wall-mounted electronic medical workstations. Whether the patented components drive customer demand or substantially create value for the Accused Products is a disputed factual question. On one hand, an Ergotron employee identified non-patented features of the Accused Products as taking away demand from Ergotron in favor of Rubbermaid. 2d Merkin Decl. Ex. J. On the other hand, vertical height adjustment is the *sina qua non* of the Accused Products—without it they would be a different product entirely. 2d Fairbairn Decl. Ex. C at 152:9-25. Furthermore, there is no dispute that the Accused Products are a single functioning unit. Therefore, a reasonable jury could find that the entire market rule applies. Cobb's application of the rule is not so unreliable it could offer no assistance to the jury. Rubbermaid at least tacitly recognizes that the rule could apply by endorsing the opinion of its expert Snelson. Snelson, like Cobb, calculated damages from net sales, without apportioning between patented and non-patented features of the Accused Products. See Snelson Report at 3 (opining that reasonable royalty would be 0.4% of *net sales*) (emphasis added).

More troubling is Cobb's inconsistent testimony about application of the entire market value rule. At his deposition he testified that he did not apply the rule. 2d Merkin Decl. Ex. I at 232:19-23. However, in his report he clearly alludes to applying the rule by stating both that the patented features are the basis for customer demand of the Accused Products and that the patented features substantially created value of the component parts. Cobb Report at 18.

Inconsistencies in expert testimony do not warrant exclusion under Rule 702; rather, they are appropriate topics for cross-examination.  See, e.g., Advanced Fiber Tech. Trust v. J & L Fiber Servs., Inc., No. 1:07-CV-1191, 2010 WL 1930569, at *6 (N.D.N.Y. May 11, 2010) (denying Daubert motion premised on inconsistencies between report and later deposition testimony).

Rubbermaid also attacks Cobb's royalty rate of 10%, claiming it lacks any evidentiary support.  Cobb's opinion on the appropriate royalty rate was influenced, in part, by allowing Rubbermaid a profit margin of 30% on the accused products.  Cobb Report at 21.  The 30% profit margin was influenced by the historical profit margins for Rubbermaid.  June 6, 2012 Suppl. Decl. of Shelley Merkin [Docket No. 99] ("4th Merkin Decl.") Ex. A at 204:12-20.  Allowing Rubbermaid a 30% profit margin would lead to a royalty rate of slightly above 10%.  Id. at 204:21-23.  Rubbermaid argues that Cobb's opinion is unreliable because he does not articulate precisely how he arrived at 10%, and no single factor specifically points to that number.  However, the Georgia-Pacific factors are multitudinous and not every factor is amenable to precise numerical analysis.  Therefore, in such circumstances, exacting precision is impossible and not fatal to Cobb's opinion.  Any imprecision goes to the weight and not admissibility of Cobb's opinion.

Finally, Rubbermaid challenges Cobb's opinion that a $100,000 lump-sum payment would be required.  Rubbermaid claims Cobb's opinion is not supported by sufficient evidence because he conducted no analysis regarding the exact number of due diligence and negotiation hours or fees that the $100,000 figure purportedly serves to compensate.  Rather, Cobb based his opinion on the lump-sum payments arrived at in similar negotiations.  2d Fairbairn Decl. Ex. D at 216:25–2:17:24. This methodology is not "junk science" or so unreliable as to present a risk of

seriously misleading the jury.  The jury can take the obvious "ballpark" number and do with it as they choose.  The Cobb <u>Daubert</u> motion is denied.

### 3.  Further Damages Issues Reserved for Trial

Although both <u>Daubert</u> motions have been denied, the precise path trial will take remains unknown.  As a result of the rulings on this motions, Snelson and Cobb will be allowed to testify at trial.  However, it is unknown how the record will develop at trial, and discrete issues related to the extent of their testimony may need to be revisited.  Therefore, the Court reserves the right to alter its ruling as needed as trial proceeds.  Likewise, the parties may renew discrete objections to Cobb and Snelson's testimony, if a basis for such an objection exists.

## IV.  CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.  Rubbermaid's Motion for Summary Judgment of Non-Infringement [Docket No. 79] is **DENIED**;

2.  Ergotron's Motion to Exclude Expert Testimony from Melissa Snelson [Docket No. 74] is **DENIED**; and

3.  Rubbermaid's Motion to Exclude Expert Testimony from Arthur Cobb [Docket No. 81] is **DENIED**.

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  August 28, 2012.